Estate of E. C. Lloyd, Deceased, Mary Elizabeth Lloyd, Executrix v. Commissioner.
Estate of Lloyd v. Commissioner
Docket No. 51603.
United States Tax Court
T.C. Memo 1959-208; 1959 Tax Ct. Memo LEXIS 36; 18 T.C.M. (CCH) 988; T.C.M. (RIA) 59208; October 30, 1959
*36 1. No part of the deficiencies for the calendar years 1944 through 1947 is due to fraud with intent to evade tax under section 293(b), I.R.C. 1939. 2. The statute of limitations has run for the years 1945, 1946, and 1947. 3. The net taxable income of E. C. Lloyd, deceased, is determined for the years 1942, 1943, and 1944. William S. Pritchard, Esq., and Winston B. McCall, Esq., Frank Nelson Building, Birmingham, Ala., for the petitioner. Homer F. Benson, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: Respondent determined deficiencies in income *37 tax and additions to the tax under section 293(b) of the Internal Revenue Code of 1939 against the original petitioner, E. C. Lloyd, for whom his estate, represented by Mary Elizabeth Lloyd, executrix under the will of E. C. Lloyd, deceased, has been substituted as petitioner, for the calendar years 1943 through 1947, as follows: Calendar
Additions under
Year
Deficiency
Sec. 293(b)
1943 [1]
$ 8,002.07
1944
21,265.67
$10,632.84
1945
28,523.81
14,261.91
1946
18,714.15
9,357.08
1947
10,861.29
5,430.65
The issues are: (1) Whether the respondent erred in making adjustments to the net income or (net loss) reported by E. C. Lloyd in his returns for the calendar years 1942 through 1947; (2) whether any part of the deficiencies for the years 1944 through 1947 is due to fraud with intent to evade tax under section 293(b); and (3) whether the period of limitation upon assessment and collection under section 275 has run with respect to the calendar years 1943 through 1947. At *38 the hearing the parties agreed that the period of limitation upon assessment and collection had not run as to the years 1943 and 1944 but that it had run as to the years 1945, 1946, and 1947, if there is no fraud for those years. In his brief respondent concedes that on the basis of the testimony in the record, the salary paid to Mae W. Lloyd (wife of E. C. Lloyd) in the years 1942 through 1947 is allowable in the amount of $1,600 for each year. Findings of Fact The original petitioner, E. C. Lloyd, during the taxable years in question was an individual, residing at Anniston, Alabama. He filed his individual Federal income tax returns for the calendar years 1942 through 1947 with the then collector of internal revenue for the district of Alabama. Lloyd died in August 1957. Mary is the adopted daughter of Lloyd and Mae. She was adopted in 1924 at the age of 2 months. Lloyd and Mae were married in Rome, Georgia, in 1913. At that time Lloyd was working for Mae's father where he learned the bakery business. In 1919, Lloyd and his wife moved to Anniston, Alabama, where Lloyd opened and operated Lloyd's Bakery as an individual proprietorship until the day of his death. He started *39 with $50 in cash and a horse and wagon. During the years here in question, Lloyd had approximately 30 trucks and the sales from this business averaged over $490,000 a year. The returns filed by Lloyd for the years 1942 through 1946 were prepared by Willis Wilkinson, a public accountant. Wilkinson died in the spring of 1946. The 1947 return was prepared by John J. Wooster, a public accountant who later became a certified public accountant. Alma Huggins, who was employed by Lloyd's Bakery continuously from 1920, kept the books of the bakery from 1940 through 1951 when the business was discontinued. The net income or (net loss) reported by Lloyd in his returns for the years 1942 through 1947, the adjustments made by the respondent, and the net income determined by the respondent in the deficiency notice, are as follows: 1942
1943
1944
Net income or (loss) reported
$39,884.18
$29,440.70
$24,659.46
Contested Adjustments: Sales Increased: Unidentified Bank Deposits: In wife's checking account
5,893.11
In wife's savings account
In Mary's checking account
Currency loaned by wife
Invested in U.S. Savings Bonds
10,968.75
10,912.50
Purchases Decreased: Checks drawn by Lloyd for
purchases in black market
6,000.00
Combination of inventory and
black market
Deductions Disallowed: Salaries paid to wife
1,600.00
3,600.00
4,800.00
Salaries paid to Mary
Interest paid to wife on loans
Black market expenditures
charged to shop and de-
livery expense
860.00
Expenditures charged to ad-
vertising
225.00
1,120.00
660.00
Travel expenses
3,097.16
1,694.80
1,322.36
Bad debts
1,545.22
Uncontested Adjustments
2,757.05
(2,287.07)
1,202.19
Net income determined by re-
spondent
$47,563.39
$44,537.18
$57,854.84
*40 1945
1946
1947
Net income or (loss) reported
$26,194.14
[1,021.72)
$ (802.94)
Contested Adjustments: Sales Increased: Unidentified Bank Deposits: In wife's checking account
4,839.70
622.65
1,260.56
In wife's savings account
2,257.22
In Mary's checking account
4,480.32
8,474.20
4,198.60
Currency loaned by wife
6,587.00
6,713.00
Invested in U.S. Savings Bonds
8,512.50
6,787.50
Purchases Decreased: Checks drawn by Lloyd for
purchases in black market
7,850.00
6,500.00
Combination of inventory and
black market
6,849.14
Deductions Disallowed: Salaries paid to wife
6,000.00
6,000.00
6,000.00
Salaries paid to Mary
2,000.00
Interest paid to wife on loans
300.00
300.00
Black market expenditures
charged to shop and de-
livery expense
2,995.00
300.00
Expenditures charged to ad-
vertising
300.00
Travel expenses
1,282.00
583.75
Bad debts
582.10
Uncontested Adjustments
2,886.35
3,676.79
1,189.94
Net income determined by re-
spondent
$65,315.01
$41,649.49
$27,708.30
During 1944, Mae made 19 deposits in her checking account at the Commercial National Bank in Anniston, totaling $8,409.51. *41 The respondent determined that $2,516.40 of these deposits represented salary received by Mae from Lloyd's Bakery. He could not identify the source of the balance of $5,893.11 and determined that this balance represented unreported sales of Lloyd's Bakery. Lloyd's Bakery also had a checking account at the same bank. At all times from the time the bakery was started through the year 1947 Mae had the right to draw checks on that account. She exercised that right from time to time to check out money for household expenses but at no time did she ever withdraw any currency from the business. Mae made it a practice from the beginning to save a portion of the money withdrawn for household purposes. She kept these savings in two locked metal boxes at home. By 1945, Mae had accumulated in this manner approximately $20,000. In addition to her salary from Lloyd's Bakery and her household withdrawals, Mae received rental of $175 a month from a vacant lot owned by her and Mary. She also regularly bought and redeemed United States savings bonds. She owned the house in which she and her husband and daughter lived. Beginning in January 1944, Mae began depositing in the bank some of the money she *42 had saved over the years. The so-called unidentified sum of $5,893.11 was from this source. It did not represent unreported sales of Lloyd's Bakery. During 1945 Mae made 21 deposits in her checking account totaling $9,255.20. The respondent determined that $4,140.50 of these deposits represented salary and that $275 represented rents, dividends and interest. He could not identify the source of the balance of $4,839.70 and determined that such balance represented unreported sales of Lloyd's Bakery. Such balance did not represent unreported sales of Lloyd's Bakery. During 1946, Mae made 11 deposits in her checking account totaling $3,947.40. The respondent determined that $3,324.75 of these deposits represented salary, and that the balance of $622.65 represented unreported sales of Lloyd's Bakery. Such balance did not represent unreported sales of Lloyd's Bakery. During 1947, Mae made 15 deposits in her checking account totaling $15,625.36. The respondent determined that $4,952.30 of these deposits represented salary; that $6,000 represented a transfer from her savings account; that $3,000 represented repayment of loans; and that $412.50 represented rents, dividends, and interest. *43 He could not identify the source of the balance of $1,260.56, and determined that this balance represented unreported sales of Lloyd's Bakery. Such balance did not represent unreported sales of Lloyd's Bakery. During 1946, Mae made 17 deposits in her savings account at the Commercial National Bank totaling $11,996.66. The respondent determined that $815.90 of the deposits represented salary; that $5,000 represented a transfer from her checking account; that $3,200 represented repayment of loans; and that $723.54 represented rents, dividends, and interest. He could not identify the source of the balance of $2,257.22, and determined that this balance represented unreported sales of Lloyd's Bakery. Such balance did not represent unreported sales of Lloyd's Bakery. During 1945 Mary made (or there were made for her by Mae) 17 deposits in her checking account at the Commercial National Bank totaling $5,930.32. The respondent determined that $1,450 of these deposits represented rents from the lot owned by her and her mother, and that the balance of $4,480.32 represented unreported sales of Lloyd's Bakery. Such balance did not represent unreported sales of Lloyd's Bakery. During 1946 *44 Mary made (or there were made for her by Mae) 29 deposits in her checking account totaling $11,199.20. The respondent determined that $1,525 of these deposits represented rents from the lot; that $1,200 represented repayment of loans; and that the balance of $8,474.20 represented unreported sales of Lloyd's Bakery because he could not identify the source of such balance. Such balance did not represent unreported sales of Lloyd's Bakery. During 1947 Mary made (or there were made for her by Mae) 21 deposits in her checking account totaling $8,623.60. The respondent determined that $1,475 of these deposits represented rents from the lot; that $2,950 represented repayment of loans; and that the balance of $4,198.60 represented unreported sales of Lloyd's Bakery because he could not identify the source of such balance. Such balance did not represent unreported sales of Lloyd's Bakery. During 1946 and 1947 Mae loaned her husband $6,587 and $6,713, respectively. The respondent could not identify the source of the funds loaned and as a result determined that the loans represented unreported sales of Lloyd's Bakery. Such loans were bona fide loans and did not represent unreported sales *45 of Lloyd's Bakery. During the years 1941 through 1951, United States savings bonds were purchased and redeemed by the Lloyd Family as follows: E. C. Lloyd or Mae
Mae or Mary
Total
Year
Purchases
Redemptions
Purchases
Redemptions
Purchases
Redemptions
1941
$ 1,125.00
$ 1,125.00
1942
$ 862.50
2,006.25
2,868.75
1943
6,618.75
5,100.00
$ 1,275.00
11,718.75
$ 1,275.00
1944
7,462.50
3,525.00
10,987.50
1945
4,575.00
$15,829.00
4,687.50
4,664.75
9,262.50
20,493.75
1946
3,750.00
3,750.00
3,037.50
3,000.00
6,787.50
6,750.00
1947
3,973.25
2,754.00
6,727.25
1949
8,178.50
8,178.50
1951
164.00
164.00
Total
$23,268.75
$23,552.25
$19,481.25
$20,036.25
$42,750.00
$43,588.50
No part of the funds needed to purchase such bonds came from unreported sales of Lloyd's Bakery. During the years 1938 through 1947, Lloyd and Mae withdrew from Lloyd's Bakery, exclusive of withdrawals made for payment of Federal and Alabama income taxes, amounts as follows: Amount
Accumulated
Year
Withdrawn
Total
1938
$11,544.34
$ 11,544.34
1939
7,072.40
18,616.74
1940
6,441.61
25,058.35
1941
$ 9,779.01
$ 34,837.36
1942
8,183.15
43,020.51
1943
18,863.08
61,883.59
1944
21,502.02
83,385.61
1945
15,864.06
99,249.67
1946
14,653.30
113,902.97
1947
8,670.38
122,573.35 [1]
*46 In addition to the above withdrawals from Lloyd's Bakery, Lloyd received during the years 1943 through 1947 sums from other sources as follows: 1943
1944
1945
1946
1947
Sale of pre-1943 stocks
$2,027.72
Gain on 1943 stocks
1,276.02
Dividends, interest, rent
1,807.15
$960.53
$985.91
$10,296.43
$1,800.00
Mae did not deposit all of the salary received by her in 1944. In addition to the savings of $20,000 and the proceeds from the redemption of United States savings bonds, Mae and Mary had sources of available cash in 1945, 1946, and 1947 in at least the respective amounts of $10,249.40, $35,203.36 and $22,866.64. The respondent determined that purchases of ingredients as shown on the books of Lloyd's Bakery for the years 1944, 1945, and 1946 should be decreased by $6,000, $7,850, and $6,500, respectively, for the reason that these amounts were represented by "counter checks" drawn by Lloyd to purchase supplies in the "black market" and that such alleged purchases could not be "substantiated." The purchases were actually made and as such represented a part of the cost of goods sold. *47 For the years 1942 through 1947, the respondent disallowed all of the salaries paid by Lloyd's Bakery to Mae, and for 1947 he disallowed $2,000 of the $2,600 paid to Mary. Both Mae and Mary performed valuable services for the bakery. Mae worked in the bakery from the time it started in 1919 until it closed in 1951. At the beginning, her working hours averaged between 16 and 18 hours a day. During the years here involved, she only worked about 3 days a week. When her husband was away, she ran the business completely. She had the right to and signed checks on and for the bakery throughout all the years. The salary paid to her for the years 1942 through 1944 was reasonable. For the years 1946 and 1947, Lloyd paid his wife $300 each year as interest on the money she loaned to the bakery and claimed the payments as deductions from gross income. The deductions were disallowed by the respondent on the grounds that the loans were fictitious. The loans were bona fide loans. For the years 1942 through 1946, the respondent disallowed deductions claimed by Lloyd for traveling expenses in the amounts of $3,097.16, $1,694.80, $1,322.36, $1,282, and $583.75, respectively, on the grounds that *48 the claimed deductions could not be substantiated. For the years 1942 through 1944, the amounts of $1,000, $600, and $450, respectively, were expended by Lloyd for traveling in connection with the business of Lloyd's Bakery and are allowable as deductions from gross income. The uncontested adjustments made by the respondent to the net income reported by Lloyd on his returns for the years 1942 through 1947, were numerous small adjustments both for and against Lloyd which did not involve any element of fraud. The books maintained by Lloyd's Bakery were better than the average books that were maintained in the community by like businesses. All of the books were made available to the internal revenue agents in their investigation of the returns filed by Lloyd for the years in question. During the last two or three months of 1945 and the first 10 months of 1946, Lloyd's bookkeeper made erasures in the daily sales book of the bakery pursuant to instructions by Lloyd to put away $300 weekly out of cash receipts and set it aside in a box in the safe for the purchase of merchandise on the black market. The bookkeeper gave the daily sales book to the special agent when he requested the *49 books and told him about the erasures and cash withheld when he inquired about it. A record was kept of the money put in the box and of the amounts spent for flour, sugar, and lard for the bakery. All of the money taken out of cash sales was used for the purchase of sugar, lard, or flour for the bakery. No taxable income was realized or concealed as a result of any entries in the daily sales book. The cost of the black market purchases was not put in the cost of goods. Lloyd's education was limited to the fourth grade in school. He knew nothing about accounting or bookkeeping. He made the bread and did the baking and had someone else run the office and do the bookkeeping. At the time Wooster prepared the 1947 return for Lloyd, the investigation of Lloyd's income tax matters was then in progress. Wooster discussed the actual preparation of the return with both the agents who were making the investigation and went into detail with them about the return. He showed the agents the actual return before it was filed and at that time they found no objection to the return. Wooster signed the return under a declaration on the return reading "I declare under the penaltics of perjury that *50 this return Cincluding any accompanying schedules and statements) has been examined by me and to the best of my knowledge and belief is a true, correct, and complete return." No part of the deficiencies for the taxable years 1944 through 1947 is due to fraud with intent to evade tax. The returns filed by Lloyd for the taxable years 1945 through 1947 were not false or fraudulent returns with intent to evade tax. The deficiencies and additions to the tax for those years are all barred by the statute of limitations. Opinion The respondent has determined that for the years 1944 through 1947, a part of the deficiency for each year was due to fraud with intent to evade tax and that under section 293(b) [2] of the Internal Revenue Code of 1939, 50 per centum of the total amount of each deficiency should be added to the tax. The burden of proving fraud is upon the respondent. Section 7454, I.R.C. 1954.[3] The respondent must sustain that burden by clear and convincing evidence. George L. Rickard, 15 B.T.A. 316; A. W. Mellon, 36 B.T.A. 977, 1054; Walter M. Ferguson, Jr., 14 T.C. 846, 849, appeal to C.A. 4 dismissed nol. pros. *51 ; E. S. Iley, 19 T.C. 631. Lloyd kept a good set of books. He had a competent bookkeeper who had been in his employ continuously from 1920 and who had kept the books of the bakery from 1940 through the years here in question. He employed competent outside accountants to come in and prepare his tax returns, which they did on the basis of the books. The accountants believed that the returns were properly prepared. Notwithstanding all of this, the respondent, as our facts disclose, has made numerous adjustments to the net income or (loss) reported by Lloyd on his returns. For the 6 years before us the respondent has increased *52 the taxable net income by over $166,000, or over 1.4 times the amount of $118,328.82 reported by Lloyd. Of course, the respondent's determination of tax liability, exclusive of fraud, is presumed to be correct and the burden of disproving it is upon petitioner. Rule 32 of our Rules of Practice. But as to the issue of fraud, the burden is upon the respondent, and he may fail to sustain that burden. As we said in L. Schepp Co., 25 B.T.A. 419, 437. "In other words, both parties may fail through inadequate proof on their several issues, and thus the deficiency would be sustained and the penalty set aside." See also Sidney Cohen, 27 T.C. 221, 228. In weighing the evidence as to fraud, we do not think the respondent has met his burden. "A charge of fraud has always been regarded as a serious matter in the law. Not only is it never presumed, but the ordinary preponderance of evidence is not sufficient to establish such a charge. It must be proved by clear and convincing evidence." Henry S. Kerbaugh, 29 B.T.A. 1014, affd. per curiam, 74 F. 2d 749 (C.A. 1, 1935). Here we are not convinced that there was any preconceived plan or intent on *53 Lloyd's part to defraud the Government of taxes. Respondent has not proven by clear and convincing evidence that the source of the so-called unidentified bank deposits, the currency loaned by Mae, or the amounts invested in United States savings bonds came from unreported sales of Lloyd's Bakery. About all that can be said is that he had a suspicion that such was the case but mere suspicion without more does not prove fraud. L. Glenn Switzer, 20 T.C. 759, 765. Neither do we think that Lloyd's admitted activities in the black market had in them any intention to defraud the Government of its true and correct income tax. In Zeddies v. Commissioner, 264 F. 2d 120, the Seventh Circuit, in affirming a Memorandum Opinion of this Court, said: "The Tax Court properly held that whatever overceiling payments had been made should be included in cost of goods sold in computing taxpayer's profits from sales, and credit was given accordingly. See Sullenger v. Commissioner, 11 T.C. 1076, 1077." To the same effect see Hofferbert v. Anderson Oldsmobile, 197 F. 2d 504 (C.A. 4, 1952). In support of his determination of fraud, the respondent has *54 emphasized repeatedly the fact that Lloyd told the bookkeeper to withhold $300 a week from the sales for a period of about a year during the last 2 or 3 months of 1945 and the first 10 months of 1946 for the purpose of purchasing in the black market materials that were needed in the bakery business. These purchases were made but the cost of the black market purchases was not put in the cost of goods sold so that the omission from sales and the omission from cost of goods sold completely washed out one another without affecting Lloyd's tax liability in the least. It may be noted that in all the numerous adjustments made by the respondent to the net income reported by Lloyd, as set out in our findings, there were no adjustments made (and properly so) by reason of these weekly withholdings of $300 from sales. In fact, one of the revenue agents who made the investigation of Lloyd's books and who testified for the respondent admitted that there would be no additional taxes due by reason of these weekly withholdings of $300. After a careful consideration of the entire record, we conclude that the respondent has not established by clear and convincing evidence that any part of the deficiencies *55 for the years 1944 through 1947 was due to fraud with intent to evade tax. We so find and we so hold. It follows that there are no deficiencies and no additions to the tax for the years 1945, 1946, and 1947, since the parties have agreed that the period of limitations upon assessment and collection has run for those years, if there is no fraud. As to the years 1942, 1943, and 1944, aside from the uncontested adjustments made by the respondent for those years, we hold that petitioner has failed to prove error on the part of the respondent relative to the deductions disallowed for shop and delivery expense for 1944, advertising for 1942, 1943, and 1944, and bad debts for 1944. As to travel expenses for the years 1942, 1943, and 1944, we have applied the rule laid down in Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930) and, bearing heavily upon the taxpayer, we have found that the amounts of $1,000, $600, and $450 were expended by Lloyd for the years 1942, 1943, and 1944, respectively, for traveling in connection with the business of Lloyd's Bakery and as such are allowable as deductions from gross income. Upon the basis of our findings, all the other adjustments made *56 by the respondent for the years 1942, 1943, and 1944 are disapproved. Decision will be entered under Rule 50. Footnotes
1. By reason of section 6 of the Current Tax Payment Act of 1943, Public Law 68, 78th Cong., ch. 120, 1st Sess., the taxable years 1942 and 1943 must be considered together.↩
1. Of this total amount Mae withdrew $38,000.↩
2. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. (b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid * * *. ↩
3. SEC. 7454. BURDEN OF PROOF IN FRAUD * * * CASES. (a) Fraud. - In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary or his delegate.↩